## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AHMED M. HEGAZY, *Individually and On Behalf of All Others Similarly Situated*,<br><br>Plaintiff,<br><br>v.<br><br>PNC INVESTMENTS, LLC; PNC FINANCIAL SERVICES GROUP, INC.; and NATIONAL FINANCIAL SERVICES LLC,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Ahmed M. Hegazy ("Plaintiff"), on behalf of himself and all others similarly situated, brings this action as a class action against defendants PNC Financial Services Group, Inc. ("PNCFSG"), PNC Investments, LLC ("PNC Investments") and National Financial Services LLC ("NSF") (collectively "Defendants").

## I.    INTRODUCTION

1.    A cash sweep account is a type of bank or brokerage account that is linked to an investment account and automatically transfers funds when the balance is above or below a preset minimum. This case arises from Defendants' exploitative and unfair implementation of their PNC Priority Bank Deposit Sweep Program ("Program"), resulting in the breach of Defendants' fiduciary duties owed to Plaintiff and similarly situated retirement account investors as their investment advisors and their contractual obligation pay a "fair and reasonable" rate of interest for "retirement accounts."

2.    Specifically, when acting as their customers' agents and fiduciaries, defendant PNC Financial, working with NFS, "sweeps" uninvested cash balances in its customers' accounts and

deposits that cash into accounts located at its wholly owned affiliate bank, PNC Bank N.A. ("PNC Bank"). Because PNC Bank's accounts pay far below market rates of interest, Plaintiff and other Class members have lost significant amounts of interest they would have otherwise earned had PNC Financial swept their uninvested cash into bank accounts that pay a reasonable market interest rate.

3.      In its Retirement Account Customer Agreement (the "Retirement Agreement"), PNC Financial specifically acknowledges that it acts as its customers' "agent" and fiduciary in establishing, maintaining, and operating their retirement accounts. Additionally, in PNC Investment's Proprietary Bank Deposit Sweep Program (BDSP$^{SM}$) Disclosure Document ("Program Disclosure"), "NFS, as your agent as custodian, will establish the Deposit Accounts for you at the Program Bank and make deposits to and withdrawals from the Deposit Accounts." Under the broad scope of the agency, PNC Financial and NSF select the banks to participate in the Program, the type of accounts to which the Program applies, the type of bank accounts in which its customers' funds are swept, the negotiation and agreement as to the interest rates to be paid to its customers under the Program, and the negotiation and agreement as to any compensation or the foregoing of such compensation by Defendants for the benefit of either their customers or another entity, including PNC Bank.

4.      From 2018 through March 2019, and again from March 2022 onwards, when the Federal Reserve began raising the target federal funds rate, the reasonable value of swept cash consistently exceeded the amounts paid by Defendants on sweep accounts. Comparable brokerages such as Fidelity Investments, R.W. Baird, Robinhood, and Vanguard Investments, which did not sweep cash to affiliated banks, but rather swept cash to independent, unaffiliated banks, paid substantially higher rates on swept cash, than Defendants paid. For example, Fidelity paid retirement investors as much as 2.72% APY on swept cash regardless of AUM, starting in August

2023, and R.W. Baird paid retirement investors between 2.07% to 4.15% on swept cash, depending on cash balances, as of September 8, 2023.

5.     Other metrics, including the federal funds rate, and rates paid by online banks, and government money market funds, further evidence that the paltry rates paid by Defendants on retirement sweep accounts were not reasonable.

6.     Defendants breached their fiduciary duties when they placed their customers' cash in low interest-bearing accounts held by their own affiliated bank and then pocketed the unpaid interest as additional profit.

7.     Plaintiff brings this action individually and on behalf of a Class of similarly situated individuals for breach of fiduciary duty, breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment, to recover damages arising out of Defendants' violations of the law, and for such other relief as the Court may deem just and proper.

## II.     JURISDICTION AND VENUE

8.     This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §1332(d)(2), as this action is brought as a class action on behalf of over 100 class members, one or more members of the class are citizens of a state different than the Defendants, and the amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs. The Court has supplemental jurisdiction over the alleged state law claims under 28 U.S.C. § 1367 because they form part of the same case or controversy.

9.     The Court has personal jurisdiction over Defendants because they are either headquartered in this District, have sufficient minimum contacts in this District, and/or intentionally avail themselves of the markets within this District through the promotion, marketing, and sale of their financial services. These facts render the exercise of jurisdiction by this Court necessary and proper.

10.     Venue is proper under 28 U.S.C. § 1391 because two Defendants reside in this District and a substantial part of the events, omissions, and/or relevant conduct by Defendants giving rise to Plaintiff's claims occurred in this District.

## III.    PARTIES

### A.  Plaintiff

11.     Plaintiff is a customer of PNC Financial and PNCFSG and is a resident and citizen of Orlando, Florida. Plaintiff maintained a Roth IRA in a brokerage account with Defendants in which cash was held over the course of the life of the account. While Plaintiff was Defendants' customer, the cash held in his account was automatically "swept" into a low interest-bearing bank account at PNC Bank pursuant to the Program.

### B.  Defendants

12.     Defendant PNCFSG is headquartered in Pittsburgh, Pennsylvania and incorporated in Pennsylvania. PNCFSG is one of the largest financial services institutions in the United States, with hundreds of billions of dollars in assets. PNCFSG. is the parent company of PNC Investments and is named as a defendant in its capacity as the parent company and control person of PNC Investments, LLC.

13.     Defendant PNC Investments is headquartered in Pittsburgh, Pennsylvania and incorporated in Delaware. PNC Investments, LLC is a registered investment adviser and broker-dealer and a member of the Financial Industry Regulatory Authority.

14.     NFS is headquartered in Boston, Massachusetts and incorporated in Delaware. National Financial Services, LLC is one of the largest providers of brokerage services in the country. NFS is the clearing broker for PNC Investments.

## FACTUAL BACKGROUND

### A.  Defendants' Customer Relationship

15.    The relationship between PNF Financial and its retirement account customers, including Plaintiff, is set forth in the written Retirement Agreement.  The Retirement Agreement provide that the Program is governed by the terms and conditions set forth in the Program Disclosure.

16.    Through their assent to the Retirement Agreement, customers like Plaintiff consent to their participation in the Program.

17.    The Retirement Agreement and Program Disclosure establish an agency relationship between Plaintiff, PNC Financial, and NSF.

18.    By entering a custodial and agency relationship with Plaintiff and members of the putative Class, Defendants assumed fiduciary duties including the duty of loyalty, the duty of care, the duty to act in good faith, the duty of full and fair disclosures, and the duty to make prudent investment recommendations. These fiduciary duties are meant to always ensure Defendants act with integrity and in the best interests of the client.

19.    Defendant's fiduciary duties to as broker-dealers are described in Regulation Best Interest (Reg BI) under the Securities Exchange Act of 1934, which requires them to act in the best interests of the retail customer at the time a recommendation is made. Reg BI obligates broker-dealers, when making an investment recommendation, to meet four core obligations: *Disclosure* (providing certain prescribed disclosure before or at the time of recommendation, about the recommendation and the relationship between the retail customer and the broker-dealer); *Care* (exercising reasonable diligence, care, and skill in making the recommendation); *Conflicts of Interest* (establishing, maintaining, and enforcing policies and procedures reasonably designed to address conflicts of interest); and *Compliance* (establishing, maintaining, and enforcing policies and procedures reasonably designed to achieve compliance with Reg BI).

20.     Defendants' fiduciary duties are also reflected in PNCFSG's Code of Ethics. *See* https://www.sec.gov/Archives/edgar/data/1277350/000119312504049187/dex99r3.htm.

**B.  The Bank Sweep Program**

21.     A "sweep program" is a "service provided by a broker or dealer where it offers to its customer the option to automatically transfer free credit balances in the securities account of the customer to either a money market mutual fund product as described in § 270.2a-7 or an account at a bank whose deposits are insured by the Federal Deposit Insurance Corporation." *See* 17 CFR 240.15c3-3(a)(17).

22.     Sweep deposits play a pivotal role as a capital source for banks, empowering them to utilize these deposits for various corporate purposes. This includes activities such as making loans or investing in government securities. The disparity between the interest rate paid and the interest rate earned by a bank on those deposits is commonly referred to as the net interest margin ("NIM").

23.     The SEC, in its Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers Conflicts of Interest, issued August 3, 2022, emphasized that "cash sweep programs" are a "common source[ ] of conflicts of interest." *See* https://www.sec.gov/tm/iabd-staff-bulletin-conflicts-interest.

24.     According to the Program Disclosure, PNC Bank is the *exclusive* option for the Program. PNC Financial directed all accounts participating in the Program, including Plaintiff's, to its affiliated bank, PNC Bank.

25.     The Program Disclosures provides:

Applicable law governing retirement accounts, such as qualified plans under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and individual retirement accounts under the Internal Revenue Code, necessitates that interest rates paid by the Program Bank for deposits in the Deposit Accounts, our fee, and other service fees were negotiated at arm's length, are believed to be fair

and reasonable, and are designed to approximate value for the services involved and in the context of customers' Eligible Assets.

26.    NSF acted as its customers' agent and exercised discretion with respect to the Program. For example, the Program Disclosure states: "As your agent, NFS is establishing the Deposit Accounts at the Program Bank, depositing funds into the Deposit Accounts, withdrawing funds from Deposit Accounts and transferring funds between Deposit Accounts."

27.    PNC Financial and NSF exercised their discretion concerning the Program in bad faith to the detriment of its customers, choosing PNC Bank as the Program Bank that pays an unreasonable rate of interest.

28.    The Program primarily benefited Defendants at the expense of their customers.

29.    PNC Financial enters transactions by which it establishes and pays unreasonably low interest rates to its customers in the Program. In contrast to the unreasonably low returns PNC Financial pays its customers, PNC Financial shifts to its affiliated bank a substantial portion of the beneficial returns on its customers' cash that would otherwise constitute its customary compensation in connection with the Program.

30.    The Program Disclosure states: "The Program Bank earns net income from the difference between the interest they pay on Program Deposits and the fees paid to us and the income they earn on loans, investments and other assets." Thus, Defendants admit that by keeping the interest rates in Plaintiff and Class members' Deposit Accounts lower, Defendants earn a higher profit.  The Program Disclosures further acknowledge that the Program creates "a conflict of interest for us because the income received by PNC Bank and us is expected to exceed the income we would receive if a money market fund was used as a core investment vehicle." Finally, the Program Disclosures highlight that that NSF "may receive more revenue with respect to amounts in the Program than with respect to other sweep products" and that, "[a]s a result of the

fees and benefits described above, the Program may be significantly more profitable to us than other available sweep options, if any."

31.    Through their operation of the Program, Defendants engage in self-dealing, creating a profit center that benefits only them, to the financial detriment of their customers.

**C. Defendants Know the Program Must Provide a Reasonable Rate of Interest to Retirement Account Investors**

32.    Defendants acknowledge that they have a duty to offer retirement accounts investors a reasonable rate of interest, as evidenced by their own disclosures and legal sources of which they have knowledge.

33.    As alleged above, the Program Disclosures include a promise to pay a reasonable rate of interest for retirement accounts. Thus, Defendants knew or should have known that it was unlawful and a breach of their duties to provide far less than a reasonable rate of interest in the Program for retirement accounts such as Plaintiff's and all Class members'.

34.    The requirement to pay a reasonable rate of interest derives from the Internal Revenue Code ("IRC"). Section 4975 of the IRC (entitled "Tax on Prohibited Transactions"), applies to IRAs generally, including Plaintiff's Roth IRA. *See* 26 U.S.C. §4975(e)(1)(B) (defining "plan" to include "an individual retirement account described in [IRC] Section 408(a)"). IRC §4975(c)(1)(B) defines as a "prohibited transaction" the "lending of money or other extension of credit between a plan [i.e., an individual IRA] and a disqualified person." A "disqualified person," under Section 4975(e)(2) includes, among others, "a fiduciary" and "a person providing services to the plan." Defendants and PNC Bank are "disqualified person[s]" under Section 4975(e)(2) and, therefore, the sweep agreement for retirement accounts between Plaintiff and Defendants are "prohibited transaction[s]" under § 4975(c)(1)(B).

35.    IRC §4975(d)(4) provides several "exemptions," or safe harbors, for otherwise

"prohibited transactions," one of which is "the investment of all or part of a plan's assets in deposits *which bear a reasonable interest rate* in a bank or similar financial institution." (Emphasis added).

36.     Section 4975 recognizes that related party transactions into which customers are defaulted (such as Defendants' Program) can offer interest rates that may become unfairly lowered due to inherent conflicts of interest.  Accordingly, conflicted transactions such as affiliated entity cash sweeps are required to pay a reasonable rate of interest. Retirement account customers are particularly vulnerable to receiving inadequate compensation for the use of uninvested cash in their accounts. IRC Section 4975 thus seeks to ensure related party transactions involving retirement accounts are priced at fair market rates.

37.     Regulations promulgated by the Department of the Treasury confirm that the cash swept from a retirement account by a brokerage to an affiliated bank is a "prohibited transaction" but would be permissible (i.e., be within the exemption or safe harbor) if it paid "a reasonable rate of interest." Thus, Treasury regulations state that "Section 4975(d)(4) exempts from the excise taxes imposed by section 4975 investment of all or a part of a plan's assets in deposits bearing a reasonable rate of interest in a bank or similar financial institution . . . , even though such bank or similar financial institution is a fiduciary or other disqualified person with respect to the plan." 26 C.F.R. §54.4975-6(b)(1).

38.     Treasury regulations also mandate that when a financial institution "invests plan assets in deposits in itself or its affiliates under an authorization contained in a plan or trust instrument," the authorization "must name" the institution and "must state that [it]  . . . may make investments in deposits which bear a reasonable rate of interest in itself (or in an affiliate)." *Id*. § 54.4975-6(b)(3).

39.     Similarly, ERISA Section 408(b)(1) exempts from prohibition various interested

party transactions that "bear a reasonable rate of interest," among other requirements. *See* 29 U.S.C. §1108(b)(1).

40.     Additionally, FINRA Rule 2122 expressly provides that "[c]harges, if any, for services performed . . . shall be reasonable and not unfairly discriminatory among customers."

41.     PNCFSG is a member of the American Banker's Association. A March 15, 2017 letter to the Department of Labor from the American Bankers Association, states that with respect to the investment of IRA assets into "one or more bank deposit products, . . . banks have routinely relied on the statutory exemption [for prohibited transactions] available for bank deposit product programs under Section 4975(d)(4) of the Code . . . ." In support of this contention, the ABA attached a white paper from Morgan, Lewis & Bockius LLP, which notes that a bank may "invest an IRA's assets in its own deposit accounts" "which bear a reasonable interest rate" pursuant to the exemption "found in Section 4975(d)(4) of the Code and Section 408(b)(4) of ERISA." This correspondence constitutes further evidence of Defendants' recognition that their sweep programs constitute conflicted, presumptively prohibited transactions that are only permitted if depositors are receiving a "reasonable" rate of interest.

**D. PNC Financial and NSF Placed Class Members' Cash in Shockingly Low Interest-Bearing Accounts at PNC Bank.**

42.     PNC Financial and NSF breached their fiduciary and contractual duties by failing to negotiate higher and reasonable interest rates for their customers' uninvested cash in operating the Program.

43.     As its customers' agent and financial advisor, PNC Financial was contractually and legally obligated to act in the best interest of its clients. PNC Financial's practice of extracting excessive fees from its customers' cash sweep deposits, through the negotiation of unreasonably low interest rates with its affiliated bank, PNC Bank, was against its customers' interests.

44.    PNC Financial did not negotiate higher and reasonable rates of interest for its customers' cash sweep deposits, but instead it worked in consultation with its affiliated bank to set artificially and unreasonably low interest rates for deposit accounts in the Program.

45.    PNC Financial's low interest rates are not reasonable. Section 4975 and ERISA Section 408 place the burden of demonstrating reasonableness on the financial institution. Defendants cannot meet this burden because the interest rates they used in the Program do not meet any definition of a reasonable rate.

46.    Based on its ordinary meaning (using Webster's and Oxford dictionary definitions), "reasonable" is synonymous with "fair." Accordingly, "reasonable" in the valuation context is synonymous with "fair market value" and can be determined using a market approach of comparable instruments. A reasonable rate of interest is the rate that would result in a competitive market under fair market conditions – in other words, an interest rate parties would agree to in an arm's length transaction where neither party is about exert market power over the other.

47.    Fair market value is defined by the IRS as: "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." 26 C.F.R. § 25.2512-1.

48.    IRS regulations define an "arm's-length interest rate" for purposes of assessing transfer pricing between related entities as

> a rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances. All relevant factors shall be considered, including the principal amount and duration of the loan, the security involved, the credit standing of the borrower, and the interest rate prevailing at the situs of the lender or creditor for comparable loans between unrelated parties. [26 CFR § 1.482-2(a)(2)].

49.    Consistent with the plain meaning of reasonableness, which means fair, a

reasonable rate pursuant to IRC § 4975 (and as acknowledged by Defendants in some of their agreements) is one that considers other market rates for similar products in arm's-length transactions.

50.     For example, the Department of Labor, which maintains enforcement authority with respect to the prohibited transaction rules in the IRC, provided in granting the exemption, a definition of "reasonable rate" that considered a broad range of similar products to bank deposit accounts:

> A "reasonable" rate of interest means a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (e.g., in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated.

https://www.federalregister.gov/documents/2003/06/10/03-14594/grant-of-individual-exemptions-deutsche-bank-ag?utm_source=chatgpt.com.

51.     Three-month treasury bills, an instrument the Department of Labor has advised should be considered in determining a reasonable interest rate, rose in yield from 0.046% as of January 1, 2022 to 5.394% as of January 9, 2024. Nevertheless, Defendants paid interest rates during this period that were a tiny fraction of these rates.

52.     Compared to its competitors, the Program's interest rates are substantially lower than similar sweep products offered by other financial institutions. For example, Vanguard offered interest payments of 4.5% in its Cash Sweep Program; Moo Moo offered 5.1% in its Cash Sweep Program; and Fidelity offered 5%.

53.     Other brokerages that swept cash to unaffiliated banks set rates between brokerages and banks resulting from something that more closely resembles arm's-length negotiations. For example, Fidelity Investments and R.W. Baird do not sweep cash to affiliated banks, and have consistently paid substantially higher rates of interest than Defendants and other

brokerages that sweep cash to affiliated banks.

54.    At year-end 2022, Fidelity paid 2.21% interest on cash balances regardless of tier, and R.W. Baird paid between 1.58% interest (on cash balances up to $1 million) and 3.08% interest (on cash balances above $5 million). By contrast, Defendants have been paying interest rates as low as 0.04%—virtually nothing.

55.    The federal funds target rate continued to increase in 2023 hitting an effective yield of 5.33% on July 27, 2023. As the federal fund rate increased, so too did Fidelity and R.W. Baird continue to increase the rates they paid on swept cash. Defendants, by contrast, continued to pay close to no interest.

56.    On August 7, 2019, Fidelity issued a press releases announcing that "it has challenged conventional industry practices by automatically directing investors' cash into higher yielding options available for brokerage and retirement accounts as well as providing product choice – all without any minimum requirements." It continued, "Recent customer research shows that many investors don't focus on the rate paid on their cash when they open an account and, too often, they don't take action later. Fidelity has made it easy for customers by automatically giving them the higher yielding option at account opening, while also providing other investment options for those customers who prefer it." And, it noted that Fidelity's approach ""is contrary to typical industry practices of defaulting customers' cash into a low-yielding product – often at an affiliated bank – with no other option in what the industry calls a 'cash sweep.'"

57.    The rates set by Fidelity and R.W. Baird at arm's-length are evidence of the fair market or reasonable rates based on business and economic conditions. The rates set by Defendants, by default, in self-interested transactions, are not reasonable.

58.    Defendants interest rates significantly lower than its competitors, but they are also substantially lower than interest rates for money market fund rates. Nevertheless, Defendants

automatically place customers into the cash sweep programs it has developed with low yield rates that it negotiated with PNC Bank.

59.      By negotiating significantly lower rates for the cash sweep programs in which it automatically placed Plaintiff and Class members. Defendants did not act in their customers' best interests. Instead, Defendants put their own interests above their customers', making substantial net income revenue at its customers' expense. In so doing, Defendants breached their fiduciary duties, including their own Code of Ethics.

### E.      Plaintiff's Experience

60.      Plaintiff has a Roth IRA investment account with PNC Financial and has had that account for many years. Plaintiff was enrolled automatically in the Program, and so for years his uninvested cash has been automatically swept to PNC Bank selected in its discretion, at rates as low as 0.04%.

## CLASS ACTION ALLEGATIONS

61.      Plaintiff re-alleges and incorporates by reference the allegations set forth above.

62.      Plaintiff brings this action individually and as a class action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class consisting of:

> All persons who held cash positions in retirements accounts custodied by Defendants and whose cash was subject to Defendants' Program.

63.      This action has been brought and may be maintained as a class action under Federal Rule of Civil Procedure 23.

### A.  Numerosity - Rule 23(a)(1)

64.      Class members are so numerous that their individual joinder is impracticable. The precise number of Class members and their identities are unknown to Plaintiff currently. However, Defendants oversee hundreds of billions of dollars in client assets through the work

of thousands of financial advisors, and Plaintiff believes that the members of the proposed Class number in the thousands. Accordingly, Plaintiff and the Class satisfy the numerosity requirement of Rule 23.

65.    Class members may be notified of the pendency of this action by mail, published notice, or other appropriate methods.

### B. Existence and Predominance of Common Questions of Law and Fact - Rule 23(a)(2), 23(b)(3)

66.    Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following, whether:

a.    Defendants owed fiduciary duties to Plaintiff and the putative Class members in connection with the Program;

b.    Defendants breached their fiduciary duties to Plaintiff and the putative Class members in  establishing, maintaining, and/or operating the Program;

c.    Defendants breached their contract with Plaintiff and the putative Class members regarding the Program, including the implied covenant of good faith and fair dealing;

d.    Defendants have been unjustly enriched because of the conduct complained of herein;

e.    this case may be maintained as a class action under Fed. R. Civ. P. 23;

f.    to what extent Class members are entitled to damages and other monetary relief; and

g.    and to what extent Class members are entitled to attorneys' fees and costs.

### C. Typicality - Rule 23(a)(3)

67.    Plaintiff's claims are typical of the claims of the Class because he was a customer of Defendants that had his cash balances improperly managed by Defendants through their administration of the Program. Thus, Plaintiff's claims are typical of the claims of the members of the Class as the claims arise from the same course of conduct by Defendants, and the relief sought within the Class is common to the members of each.

### D. Adequacy of Representation - Rule 23(a)(4)

68.    Plaintiff will fairly and adequately protect the interests of Class members. Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. Plaintiff has no interests adverse or antagonistic to those of the Class.

### E. Superiority - Rule 23(b)(3)

69.    A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are small compared with the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for the Class members, on an individual basis, to obtain effective redress for the wrongs done them.

70.    Even if Class members could afford individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

71.     Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

    a.     the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

    b.     the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

    c.     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### BREACH OF FIDUCIARY DUTY

(Asserted on behalf of the Plaintiff and the
Class against Defendants)

72.     Plaintiff repeats and incorporates by reference the factual allegations in paragraphs 1 through 71, above, as if fully set forth herein.

73.     At all relevant times, Defendants owed fiduciary duties to Plaintiff and the members of the Class in connection with the Program. Such duties independently arose out of (1) the agency relationship between Defendants, on one hand, and Plaintiff and the members of the Class on the other hand, as to the Program; (2) Defendants holding and control over beneficial funds that belonged to its customers, related to their cash sweep balances; (3) Defendants' discretion as to the Program and their customers' cash, while acting as their agent; and/or (4) the applicable industry standards, including Reg BI, FINRA standards, and Defendants' Code of Ethics.

74.     As a fiduciary to Plaintiff and the Class, Defendants owed them the highest duties of loyalty, candor, due care, and prudence in the services they provided to them in connection with establishing, maintaining, and/or operating the Program. Moreover, as a fiduciary, Defendants had a continuing duty to act exclusively for the benefit of Plaintiff and the Class in connection with establishing, maintaining, and/or operating the Program. Lastly, as a fiduciary, Defendants had a continuing duty to obtain informed consent from Plaintiff and the Class regarding the Program, and specifically make sufficiently detailed disclosures regarding the Program, their role, the role of various related parties, and any conflicts of interest to obtain such informed consent.

75.     Defendants further owed Plaintiff and the Class the fiduciary duty to act in good faith in connection with establishing, maintaining, and/or operating the Program.

76.     Defendants further owed Plaintiff and the Class the duty to charge reasonable fees for their services related to the Bank Deposit Sweep Program.

77.     Plaintiff and the Class were fully dependent upon Defendants' ability, skill, knowledge, and goodwill with respect to Defendants' Program.

78.     Defendants owed Plaintiff and the Class similar duties by virtue of their control over Defendants' policies or management regarding Program.

79.     Defendants breached their fiduciary duties by the conduct alleged herein, including by designing, structuring, and/or operating the Program to benefit themselves at the expense of their fiduciary customers, making material misrepresentations and omissions regarding the Program, violating its duty of care, and acting in their own – not their customers' – best interest vis-à-vis the Program.

80.     Defendants violated their duty of loyalty by, among other things, putting their interest above that of their fiduciary customers, failing to provide sufficient information to their fiduciary customers regarding material features of the Program to obtain informed consent from

them, and not properly disclosing their own and their affiliates' role in, and conflicts of interest arising out of the Program, as more fully shown above.

81.    As a direct and proximate consequence of Defendants' conduct as alleged herein, Plaintiff and the Class suffered damages in an amount to be determined at trial and seek disgorgement of any undue and unjust gains of Defendants, as well as all other equitable relief deemed just and proper.

<u>SECOND CAUSE OF ACTION</u>
**BREACH OF CONTRACT**

(Asserted on behalf of the Plaintiff and the
Class against Defendants)

82.    Plaintiff repeats and incorporates by reference the factual allegations in paragraphs 1 through 71, above, as if fully set forth herein.

83.    Defendants' relationship with its customers is governed by a written contract, the terms of which are contained in, and incorporated into various standardized documents drafted by Defendants, as outlined above.

84.    Defendants contractually promise that "Retirement and other benefit plan accounts will be paid a reasonable rate consistent with applicable legal and regulatory requirements."

85.    Defendants undertook to act as an agent of the customers regarding all transactions relating to the Program and were thus contractually obligated to obtain for Plaintiff and members of the proposed Class, through such transactions, rates of return on their cash balances that are reasonable and to otherwise act in their clients' best interests.

86.    As set forth herein, the rates of return paid to customers on their cash balances were not reasonable and Defendants did not act in their clients' best interests. Accordingly, Defendants breached their contracts with Plaintiff and the members of the proposed Class.

87.    Plaintiff and the members of the proposed Class suffered monetary damages

because of Defendants' breach of contract.

**THIRD CAUSE OF ACTION**
**BREACH OF THE IMPLIED COVENANT**
**OF GOOD FAITH AND FAIR DEALING**
(Asserted on behalf of the Plaintiff and the Class
Classes against Defendants)

88.     Plaintiff repeats and incorporates by reference the factual allegations in paragraphs 1 through 71, above, as if fully set forth herein.

89.     A covenant of good faith and fair dealing is implied into every contract.

90.     Plaintiff and Class members contracted with Defendants to provide them with financial and/or investment services pursuant to the Account Agreement. Under the Account Agreement, Defendants were agents of Plaintiff and Class members and owed them fiduciary duties, including to act in their best interests. Defendants failed to obtain for Plaintiff and Class members higher and reasonable rates of return on their cash balances and instead acted in Defendants' own interests. Moreover, under the Account Agreement, as broker-dealers and pursuant to Reg. BI and 84 Fed. Reg. 134, 17 C.F.R. § 276, Defendants had a duty to act in the best interests of Plaintiff and Class members and not put their interests above Plaintiff and Class members.

91.     These contracts were subject to implied covenants of good faith and fair dealing that all parties would act in good faith and with reasonable efforts to perform their contractual duties (both explicit and implied) and not to impair the rights of other parties to receive the rights, benefits, and reasonable expectations under the contracts. These included the covenants that Defendants would act fairly and in good faith in carrying out their contractual obligations to provide Plaintiff and Class member with fair and reasonable rates of return on their cash sweep balances.

92.     Defendants breached these implied covenants of good faith and fair dealing by

20

failing to provide Plaintiff and Class members with fair and reasonable rates of return on their cash sweep balances. Defendants, instead of providing fair and reasonable rates of return on their clients' cash sweep balances, provided far below market rates of return that their clients could have otherwise earned on their cash. Defendants acted dishonestly and failed to exercise and/or abused their discretion in selecting the banks which would hold Plaintiff and Class members' cash balances and in failing to negotiate reasonable rates of interest but instead negotiated higher rates of interest and fees for themselves.

93.     Plaintiff and Class members fulfilled all the terms and obligations of their contract, including paying for Defendants' services.

94.     Defendants' failure to act in good faith in providing fair and reasonable rates of return on their customers' cash sweep balances denied Plaintiff and Class members the full benefit of their bargain. Plaintiff and Class members received a minimal return on their cash sweep balances that were less than what they could have otherwise earned and less than their reasonable expectations under their contract with Defendants.

95.     As a result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff and Class members sustained damages in an amount to be determined by this Court, including interest on all liquidated sums.

### FIFTH CAUSE OF ACTION
**UNJUST ENRICHMENT**
(Asserted on behalf of the Plaintiff and
the Class against Defendants)

96.     Plaintiff repeats and incorporates by reference the factual allegations in paragraphs 1 through 71, above, as if fully set forth herein.

97.     This cause of action is pled in the alternative to the extent it is determined there is no enforceable contract.

98.    Because of Defendants' wrongful conduct as alleged herein, Plaintiff and Class members received lower interest payments on their cash sweep balances than they would have in a reasonable and fair market.

99.    Because of Defendants' wrongful conduct as alleged herein, Defendants unjustly received a benefit at the expense of Plaintiff and Class members in the form of increased interest income that belonged to Plaintiff and Class members.

100.    It would be unjust and inequitable to allow Defendants to retain these wrongfully obtained benefits.

101.    Plaintiff and Class members are entitled to restitution and disgorgement of the benefits unjustly obtained, plus interest, in an amount to be proven at trial.

## PRAYER FOR RELIEF

Plaintiff requests relief as follows:

1.    Certification of the Class under applicable Rule 23 provisions;

2.    A declaration that the Program violates Plaintiff's and Class members' rights to a reasonable rate of interest on their sweep accounts;

3.    Actual damages;

4.    Attorneys' fees and costs of suit;

5.    Prejudgment and postjudgment interest; and

6.    Such other relief as the Court deems just and proper

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable.

Dated: December 4, 2024                Respectfully submitted,

                                       **KOPELOWITZ OSTROW P.A.**

                                       */s/ Kenneth J. Grunfeld*
                                       Kenneth J. Grunfeld (Bar No. 84121)
                                       PA Bar No. 84121
                                       65 Overhill Road
                                       Bala Cynwyd, PA 19004
                                       Tel: 954-525-4100
                                       grunfeld@kolawyers.com

                                       **EDELSBERG LAW, P.A.**
                                       Scott A. Edelsberg, Esq.*
                                       scott@edelsberglaw.com
                                       Adam A. Schwartzbaum, Esq.*
                                       adam@edelsberglaw.com
                                       20900 NE 30th Ave Suit 417
                                       Aventura, FL 33180
                                       Tel: 305-975-3320

                                       **SHAMIS & GENTILE, P.A.**
                                       Andrew J. Shamis, Esq.*
                                       ashamis@shamisgentile.com
                                       14 NE 1st Avenue, Suite 1205
                                       Miami, Florida 33132
                                       Telephone: 305-479-2299

                                       *Counsel for Plaintiff and the Proposed Class*

                                       **Pro Hac Vice Applications to be Filed*